# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| M.E.M. VENTURES, LLC, d/b/a ROUND GROVE FARM CENTER,<br><br>Plaintiff,<br><br>v.<br><br>THE WHITE GROUP, INC.,<br><br>Defendant. | CAUSE NO.: 4:16-CV-23-TLS |

## OPINION AND ORDER

In this litigation, the Plaintiff, M.E.M. Ventures d/b/a Round Grove Farm Center, alleges that liquid fertilizer leaked out of two storage tanks located on its property, and that the cause of the leaks was a defect in liners that the Defendant, The White Group, had sold to the Plaintiff and installed several years earlier. This matter is before the Court on the Defendant's Motion for Summary Judgment [ECF No. 25], and all related briefing. The Defendant has also filed a Motion to Strike Evidence Submitted by Plaintiff in Response to Defendant's Motion for Summary Judgment [ECF No. 34].

## MOTION TO STRIKE

The Defendant moves to strike two lines of testimony from the record, both of which were offered by the Plaintiff's owner and president, Patrick Murphy. The Defendant argues that the statements are inadmissible, or that they are entitled to no probative weight. Because the Court can distinguish which statements may properly be considered when deciding whether summary judgment is appropriate, the Court will not rule on the Defendant's Motion to Strike

[ECF No. 34] as a separate motion. The Court has noted the Defendant's objections and will consider the objections to the extent they arise in the Court's summary judgment analysis.

**FACTUAL BACKGROUND**

In 2008, the Defendant sold the Plaintiff two liners that were to be installed inside large storage tanks that a third party, Skinner Tank, was constructing on the Plaintiff's property; a South Tank and a North Tank. The tanks would be used to store liquid fertilizer. The Defendant's owner and president, Steven White, handled the sale. He convinced Murphy to purchase liners treated with Elvaloy because they were superior to similar liners and had a longer warranty period. The total purchase price for both liners was over $100,000 and included installation. The contracts provided for both an installation warranty and a ten-year, pro-rated materials warranty. The warranty specified that the Defendant "cannot be held responsible for damages to the liner from overfilling the tank or from the owner or any other third party entering the tank." (ECF No. 27-1 at 37.)

The Defendant ordered the liners from Specialty Plastics Fabricators and they were shipped directly to the Plaintiff's facility. The invoices described the product as Elvaloy. The Defendant's employee, Steve Hunter, acted as the foreman for installation. Based on his experience with both kinds of liners, Hunter believed that he was installing Elvaloy liners. They had the distinct physical properties, in term of coloring, odor, and feel, that he was accustomed to with Elvaloy liners. The South Tank liner installation was completed on August 14, 2008, and the North Tank liner installation was completed on September 10, 2008. Hunter vacuum tested each liner after installation to ensure that there were no leaks. The Plaintiff visually inspected the

liners after they were installed and found there to be no problems. The Plaintiff began using the tanks to store liquid fertilizer.

Almost five years later, in June 2013, one of the Plaintiff's neighbors informed the Plaintiff that the area around the South Tank had an ammonia smell, and advised that he check it out. The Plaintiff's personnel inspected the area and discovered that the ground was saturated. When they dug a trench, it quickly filled with liquid fertilizer. On July 2, 2013, an employee for the Plaintiff conducted an inventory. Although computer records showed that the Plaintiff should have had 410 tons of product in storage, the physical count revealed only 180 tons.

The Plaintiff advised both the Defendant and Skinner Tank about the loss of product. Hunter responded on behalf of the Defendant. After cleaning out the tank, he pulled a vacuum and checked for leaks.[1] Finding no leaks, and noting that visible staining was present all the way to the top of the liner, on the white polypropylene strips that held the liner in place, and on the tank itself, he concluded that overfilling was the problem. There were no other tests conducted on the South Tank liner.

When Hunter was on the Plaintiff's property inspecting the South Tank, he noticed that the manway gaskets on the North Tank had been improperly installed. The Plaintiff's employees had installed the gaskets in 2010 using parts they purchased from the Defendant. Hunter also observed that the bolt holes had significantly elongated and were torn in various areas. White was advised of the damage to the manway boot, but did not believe that the damage could be fixed, so Murphy contacted a different liner company, Agraliners, for the repair. Agraliners

---

[1] Hunter used a large vacuum pump to remove all the air from between the tank and the liner, and to suction the liner to the tank. He then went inside the tank with a listening device that was designed to hear only high frequencies and would amplify the sound of any leak.

replaced the manway boot in November 2013. At that time, there was damage to the boot, but none to the tank liner.

Nearly a year later, on September 29, 2014, the Plaintiff's personnel noticed the smell of ammonia around the North Tank when adding fertilizer. When Hunter visually inspected the tank, there was a foot or less of product in the tank. Hunter could not visibly see any tears in the lining. He noticed the same signs of overfilling on the North Tank that he had observed on the South Tank. Additionally, he noticed that the liner was pushed inward at the bottom, as if liquid fertilizer was behind it, trapped between the liner and the steel tank. When Hunter returned to the North Tank a second time, the liner had a visible tear in it.

On September 16, 2015, the Donan Engineering Company conducted a study of the North Tank to determine the cause of the liner failure. Forensic Engineer Steven F. Richey opined that the liner had suffered a brittle fracture.

> With the liner tented at the bottom corner, tensile forced were applied when liquid was added and released when the liquid was removed. The fluctuating load fatigued the fabric, and a crack developed in the fabric. The lack of reduction in thickness at the fracture line indicates that the material was not stretched; therefore, it was not overloaded. The crack propagated, causing the failure of the liner. The characteristics of the failure are consistent with a sudden brittle fracture. The cause of the brittle failure would require analysis from a laboratory specializing in this field of materials.

(Richey Report, ECF No. 27-5 at 5.) The Report concluded that the liner "did not withstand the environment of the application." (*Id.* at 6.)

The Report also addressed whether the liner contained Elvaloy, which is a resin modifier used to enhance the properties of other resins. Dupont Elvaloy 742 is an ethylene/vinyl acetate/carbon monoxide copolymer. One such company that was known to use Elvaloy was Seaman Corporation. "Their product, XR-5, contains Elvaloy. It is unknown how it compares to the product used by the White Group." (*Id.* at 4.) Richey concluded that the thickness and the

4

weight of the Seaman product and of the Plaintiff's North Tank liner were similar, but that the tear strength of the Seaman product was greater. A laboratory analysis indicated that the material of the liner was "consistent with copolymers of ethylene vinyl acetate and vinyl chloride. The analysis is inconclusive whether the materials contain the terpolymer as those in the [Seaman] Elvaloy product. The material used as the liner is not 100 percent Elvaloy, but it possibly contains one of its components as an Elvaloy resin." (*Id.* at 5.)

## ANALYSIS

Indiana has adopted the Uniform Commercial Code (UCC), which is a unified set of statutes designed to harmonize state laws governing commercial transactions. Section 2 of the UCC applies to sales of goods, which are defined as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale." Ind. Code § 26–1–2–105. Indiana applies the "predominant thrust test" when determining whether a contract that involves a mix of both goods and services are subject to the UCC. "Under the predominant thrust test, the applicability of the UCC to a mixed transaction is determined by considering whether the transaction's 'predominant factor, [its] thrust, [its] purpose, reasonably stated, is the rendition of service, with goods incidentally involved . . . or is a transaction of sale, with labor incidentally involved.'" *Insul–Mark Midwest, Inc. v. Modern Materials, Inc.*, 612 N.E.2d 550, 553–54 (Ind. 1993) (alterations in original).

Neither party disputes that the sale of the tank liners, with installation services included, was a sale of goods subject to Section 2 of the UCC. *See, e.g.*, *Baker v. Compton*, 455 N.E.2d 382, 385 (Ind. Ct. App. 1983). The general obligations of the parties in a contract for sale of goods are for "the seller . . . to transfer and deliver and [for] the buyer . . . to accept and pay in

accordance with the contract." Ind. Code § 26-1-2-301. In the course of contracting, the seller can create an express warranty by:

> (a) any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
>
> (b) any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
>
> (c) any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

Ind. Code § 26-1-2-313.

> A buyer is deemed to have accepted goods when the buyer:
>
> (a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or
>
> (b) fails to make an effective rejection (IC 26-1-2-602(1)), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or
>
> (c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

Ind. Code § 26-1-2-606. The effect of acceptance is that the buyer must pay the contract price for the goods. *Id.* § 26-1-2-607(1). Additionally, acceptance "precludes rejection of the goods accepted." *Id.* § 607(2).

The remedies available to a buyer for a seller's breach differ depending on whether (1) the buyer has not received the goods, either because the seller failed to make delivery of the goods or the buyer rightfully rejected or justifiably revoked acceptance, Ind. Code Ann. § 26-1-2-711, or (2) the buyer has accepted goods and, after a reasonable time after discovering a breach, notified the seller of the breach, Ind. Code § 26-1-2-714. With regard to the latter, the buyer "may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is

reasonable." Ind. Code § 26-1-2-714(1). "The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount." *Id.* § 714(2). Incidental and consequential damages may also be recoverable. *Id.* § 714(3); § 715. As the commentary to § 714 states, the "section deals with the remedies available to the buyer after the goods have been accepted and the time for revocation of acceptance has gone by." *Id.* § 741, cmt. 1.

Indiana Code § 26-1-2-725 sets out the statute of limitations that apply to a breach of contract for the sale of goods:

> (1) An action for breach of any contract for sale must be commenced within four (4) years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one (1) year, but may not extend it.
>
> (2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance, the cause of action accrues when the breach is or should have been discovered.

Ind. Code § 26-1-2-725.

### A. Breach of Contract

Count I of the Plaintiff's First Amended Complaint is for breach of the contracts for the sale of the two liners. The Defendant argues that breach of contract is not an appropriate cause of action under the circumstances of this case. Describing the difference between a breach of contract claim and a breach of warranty claim, the Defendant posits that "a breach of contract claim arises where a buyer rejects goods, revokes acceptance, or the seller has entirely failed to deliver a product, whereas a breach of warranty claim arises where the buyer has accepted the

7

goods and later claims the goods failed to conform to the contract." (Def.'s Br. 19, ECF No. 26.) Accordingly, because the Plaintiff had accepted the liners, its claims in this litigation are limited to breach of warranty, which is governed by Indiana Code § 26-1-2-714. The Plaintiff disputes this, asserting that it can maintain claims for both breach of contract and breach of warranty related to the failure of the South and North Tank liners. The Plaintiff also argues that it cannot be deemed to have accepted the liners.

According to the Plaintiff, acceptance did not occur because the Plaintiff did not know of the nonconformity until after the liners had failed and, thus, did not signify to the Defendant that it would take or retain the goods "in spite of their nonconformity." (Pl.'s Resp. 12, ECF No. 31.) The Court finds the Plaintiff's argument to be premised on an incomplete reading of the definition of acceptance, which provides that "[a] buyer is deemed to have accepted goods when the buyer: (a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; *or* fails to make an effective rejection . . . *or* [d]oes any act inconsistent with the seller's ownership." Ind Code. § 26-1-2-606(1) (emphasis added). The Plaintiff's argument ignores the statutory use of the disjunctive "or" and makes no attempt to conform to the evidence in this case; the liners were delivered, installed, and used by the Plaintiff for several years.

What is more, if the Plaintiff truly cannot be deemed to have accepted the liners, it would have no damages for nonconformity of tender, including breach of warranty. *Id.* § 714 (setting forth recovery for buyer who has "accepted goods"). The damages for breach of warranty are generally the "difference at the time and place of *acceptance* between the value of the goods *accepted* and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount." *Id.* § 714(2) (emphasis added).

8

Nor does the Plaintiff attempt to explain how it would avoid the running of the four-year limitations period set out in § 725, given that accrual occurs "when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." *Id.* § 725. If the liners were not conforming as the Plaintiff alleges, they were not conforming in 2008 when they were delivered and installed, eight years before the Plaintiff filed suit. Therefore, because the Plaintiff filed this litigation more than four years after it received delivery of the liners, its breach of contract claims, as distinct from any breach of warranty claims, are time-barred.

For these reasons, the Court will grant the Defendant's judgment as a matter of law on the breach of contract claims contained in Count I of the First Amended Complaint.

### B. Breach of Warranty

Count II of the First Amended Complaint sets forth a claim for breach of warranty. Under Indiana law, to prevail on a breach of warranty claim, the plaintiff must show (1) the existence of a warranty; (2) breach of that warranty; and (3) that the breach was the proximate cause of the loss sustained. *See Irmscher Suppliers, Inc. v. Schuler*, 909 N.E.2d 1040, 1048 (Ind. Ct. App. 2009); *Frantz v. Cantrell*, 711 N.E. 2d 856, 860 (Ind. Ct. App. 1999). "The standard to be applied in determining whether or not there has been a breach of warranty is one of reasonableness in light of surrounding circumstances." *Barnes v. Mac Brown and Co., Inc.*, 342 N.E.2d 619, 621 (Ind. 1976).

It is not genuinely disputed that the contract in this case involved an express warranty that obligated the Defendant to deliver goods that conformed to the affirmation, promise, or description contained in the contract. Ind. Code § 26-1-2-313. The contract provided that "[a]ll material is guaranteed to be as specified." (ECF No. 27-1 at 36.) The contract stated that the

materials for the Elvaloy liner would be unreinforced 60 mil Elvaloy for the floor and the first four feet, and 40 mil reinforced Elvaloy for the shell. And, because the ten-year prorated "warranty explicitly extend[ed] to future performance of the goods and discovery of the breach must await the time of such performance, the cause of action accrue[d] when the breach is or should have been discovered." *Id.* § 725.

### 1. The South Tank

With respect to the South Tank, the Plaintiff has not presented evidence from which a reasonable jury could rely to conclude that the Defendant breached the warranty, or that the breach was the proximate cause of the loss of product. In its pending motion for summary judgment, the Defendant has identified those portions of the record that it believes demonstrates the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Accordingly, the Plaintiff was required to marshal and present the court with the evidence on which a reasonable jury could rely to find in its favor. *See AA Sales & Assocs., Inc. v. Coni-Seal, Inc.*, 550 F.3d 605, 613 (7th Cir. 2008). "When a plaintiff fails to produce evidence, the defendant is entitled to judgment; a defendant moving for summary judgment need not produce evidence of its own." *Marion v. Radtke*, 641 F.3d 874, 876–77 (7th Cir. 2011) (citing *Celotex Corp.*, 477 U.S. 317). "A district court should deny a motion for summary judgment only when the non-moving party presents admissible evidence that creates a genuine issue of material fact." *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (first citing *United States v. 5443 Suffield Terrace*, 607 F.3d 504, 510 (7th Cir. 2010); then citing *Swearnigen–El v. Cook Cty. Sheriff's Dep't*, 602 F.3d 852, 859 (7th Cir. 2010)). Material facts

are those that are outcome determinative under the applicable law. *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997).

Fertilizer was located on the ground near the South Tank. An inventory of product showed that there was a shortage. By this, the Plaintiff concludes that the liner must have failed. Or at least that a jury could so decide. But it is an undisputed fact that Hunter conducted a vacuum test of the South Tank liner, which established that it did not have any leaks or holes. The Plaintiff's employees also inspected the liner before removing it; they did not notice any tears or holes. There has been no evidence identified in the record that would suggest these tests and inspections were not trustworthy. Additionally, there are no contradictory findings from any other source that identified a malfunction in the liner that likely caused the loss of product.

The Plaintiff counters that it is not required to designate direct evidence that identifies a specific defect as the cause of the breach of warranty. (Pl.'s Resp. 13 (citing *A.A.A. Exteriors, Inc. v. Don Mahurin Chevrolet & Oldsmobile, Inc.*, 429 N.E.2d 975, 978 (Ind. Ct. App. 1981)).) *A.A.A. Exteriors* involved the destruction of a truck by fire when the transmission overheated. 429 N.E.2d at 978 ("It seems clear that a truck with an overheating transmission does not meet the test of merchantability.") The court in *A.A.A. Exteriors's* noted that a plaintiff pursuing a claim for breach of the implied warranty of merchantability may rely on circumstantial evidence, and is not required to prove the specific defect in a product where a malfunction is not accompanied by "abnormal use and reasonable secondary causes." *Id.* Notably, all the cases cited in *A.A.A. Exteriors* had a common factor; they involved mechanical malfunctions. *See Holloway v. Gen. Motors Corp. Chevrolet Div.*, 271 N.W.2d 777 (Mich. 1978) (involving break in the ball joint assembly in the front suspension of a vehicle); *Gamo v. Gen. Motors Corp.*, 207 N.W.2d 146 (Mich. Ct. App. 1973) (involving failure of brakes on a 4 ½ month-old vehicle); *Worthey v.*

11

*Specialty Prods., Inc.*, 591 S.W.2d 145 (Mo. Ct. App. 1979) (involving failed engine in the sale of a used truck); *MacDougall v. Ford Motor Co.*, 257 A.2d 676, 678 (Pa. Super. Ct. 1969) (noting that "the occurrence of a mechanical malfunction evidences a 'defective condition' without proof of the specific defect in design or assembly causing the malfunction"). This case, by contrast, does not involve the mechanical malfunction of a machine, which can be sufficient to show that the machine "obviously lacks fitness." *A.A.A. Exteriors*, 429 N.E.2d at 978 (quoting *MacDougall*, 257 A.2d at 679). In fact, it involves no evidence of any malfunction.

The circumstantial evidence in this case is that the Plaintiff lost fertilizer that was supposed to be contained in the South Tank. What is missing is any evidence that this was the result of a malfunctioning liner.[2] Absent any hole, tear, break, or other way for the product to escape through the liner, a jury has no basis to conclude that the liner was defective—in any manner. The Court finds misleading the Plaintiff's argument in its response brief that the North Tank liner, which was purchased at the same time as the South Tank liner, was "found to possess insufficient tear strength for an Elvaloy liner and that the liner might not be Elvaloy at all." (Pl.'s Resp. 15.) First, the Report found only that the tear strength of a different product was greater than that of the Defendant's liner. It did not state that is was insufficient for an Elvaloy liner, or

---

[2] In its submission of evidence, one of the material facts that the Plaintiff cites is that the liner failed. This statement is based on Murphy's testimony that, because there was fertilizer on the ground outside of the tank, the liner leaked. (*See* Pl.'s Resp. ¶ 10 (citing Murphy Dep., ECF No. 31-1 at 69–70).) This unsupported conclusion about how fertilizer came to be outside the tank is not evidence from which a jury could conclude that the liner did not function as stated in the warranty. *See Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015) ("Favor toward the nonmoving party [on summary judgment] does not extend to drawing inferences that are supported by only speculation or conjecture.") (quoting *Lawrence v. Kenosha Cty.*, 391 F.3d 837, 842 (7th Cir. 2004)). Likewise, Murphy's testimony that he did not recall Hunter's inspection of the South Tank liner cannot create a genuine issue of material fact regarding the results of that inspection. *See, e.g.*, *Unterreiner v. Volkswagen of Am., Inc.*, 8 F.3d 1206, 1211 (7th Cir. 1993) ("[A]t some point a party who discounts his knowledge of a certain subject cannot create a 'genuine' issue of fact by contradicting unequivocal testimony about the subject."), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013).

that the products were represented to be the same. Moreover, insufficient tear strength was not indicated to be the cause of the crack in the North Tank liner. So even if it was pertinent to the South Tank, which experienced no tear or crack, the Report would not support the Plaintiff's argument that it has established a *prima facie* breach of warranty claim, which requires that the alleged breach be the proximate cause of the loss. Second, when the party with the burden of proving a breach says that something "might not be Elvaloy," it is no more probative than saying it might be Elvaloy. The Plaintiff cannot offer an "inconclusive" analysis (Richey Report at 5) as proof of a defect.

Additionally, unlike in *A.A.A. Exteriors*, this case is not devoid of abnormal use or reasonably secondary causes. A reasonable secondary cause of lost product is overfilling the tank, which causes fertilizer to get behind the liner and leak through the secondary containment, the steel tank itself. Murphy maintains that the tank had never been overfilled. The tank did not contain any sensor that would detect overfilling, and Murphy's testimony is not grounded in his own observations. *See* Fed. R. Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). Murphy's claim about overfilling is based solely on hearsay information from his employees that they watched the tank closely when they filled it, keeping the product eight to twelve inches below the top of the liner. (Murphy Dep. 111, ECF No. 31-1 at 35 ("Q. How do you know that [the tanks] haven't ever been overfilled? A. According to my employees, filled them at most, kept them about eight inches, twelve inches below.").) "A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) (collecting cases).

In response to the summary judgment motion, the Plaintiff makes no attempt to explain why the very top of the tank, including a strip that is bright white when installed, was stained the same color as the parts of the liner that had been in contact with the fertilizer. Instead, the Plaintiff attacks this evidence by arguing that it is the Defendant who has not designated any evidence to show when the tank was overfilled, by how much it was overfilled, or that the liner's failure was causally related to overfilling. These arguments are not well taken. For timing, it is enough to know that the tank was overfilled prior to Hunter's inspection in 2013. Overfilled, by definition, means that it was filled beyond the point where the liner could contain the fertilizer. Finally, it is not the Defendant's burden to prove the cause of the lost product absent some evidence of a defect in the liner. *See Coachmen Indus., Inc. v. Kemlite*, No. 3:06-CV-160-CAN, 2008 WL 4858385, at *15 (N.D. Ind. Nov. 10, 2008) (interpreting "the standard in *AAA Exteriors* as the 'base' on which [the plaintiff] must establish its *prima facie* case" before the burden would "shift to [the defendant] to establish that other potential factors exist"); *see also Castagna v. Newmar Corp.*, 340 F. Supp. 3d 728, 738 (N.D. Ind. 2018). In *Castagna*, the court cited the holding from *Royal Bus. Machs., Inc. v. Lorraine Corp.*, 633 F.2d 34, 46 (7th Cir. 1980), that under Indiana law "a plaintiff may not recover 'where the facts proven show that there are several possible causes of an injury, for one or more of which the defendant was not responsible and it is just as reasonable and probable that the injury was the result of one cause or the other.'" *Id.* However, it noted that, "[a]t summary judgment, . . . a plaintiff need only offer evidence from which a jury could find that the defendant's fault is more likely." *Id.* (citing *A.A.A. Exteriors*, 429 N.E.2d at 978–79)).

Here, the Plaintiff has not presented evidence from which a jury could find it more likely that the Defendant was at fault, or that eliminates a viable secondary cause. The sheer volume of

the missing inventory does not dictate a different outcome, as there is no time limit placed on the period over which the product was lost. The only evidence is that there was a physical inventory conducted in July 2013. There is no indication when the most recent proceeding inventory had been conducted, or what it revealed. This information, in a contextual vacuum, is not evidence form which a jury could conclude that a breach of warranty caused the loss. *See SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009) ("[A] factual dispute is 'genuine' only if a reasonable jury could find for either party.") (first citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000); then citing *de la Rama v. Ill. Dep't of Human Servs.*, 541 F.3d 681, 685 (7th Cir. 2008)). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. The Plaintiff has not presented any facts that, if believed by the finder of fact, would permit it to conclude that the Plaintiff suffered damages because the liner that was installed inside the South Tank was not as warranted.

### 2. North Tank

It is undisputed that, at some point in 2014, the North Tank liner failed. The Defendant argues that it is not liable to the Plaintiff because their contract stated that the Defendant "cannot be held responsible for damages to the liner from overfilling the tank or from the owner or any other third party entering the tank." (ECF No. 27-1 at 37.) The Defendant asserts that any of the delineated actions void the warranty. The Plaintiff argues that the Defendant's interpretation is wrong, and that the actions must, under the plain language of the contract, cause the damages at issue. The Court agrees with the Plaintiff. As written, the warranty only limits the Defendant's liability if the buyer or a third party damages the liner by overfilling the tank or entering the tank.

15

The Defendant argues that, even if the Plaintiff is correct that the warranty can only be voided if overfilling, the acts of the owner, and/or acts of a third party caused the damage the liner, the following events, in sequence, establish that the Plaintiff voided the warranty:

- The Plaintiff's personnel install the manway gasket on the North Tank improperly.

- The manway boot of the North Tank is found to be seriously damaged (at the time of the inspection primarily related to the South Tank).

- Steve White and Pat Murphy disagree as to if/how the manway boot on the North Tank can be repaired.

- Murphy has a third party, Agraliners, repair the manway boot.

- Hunter inspects the North Tank, before the tear is present, and notices the liner bunched up in the middle, indicative that the liner has been overfilled and product has pushed the liner out from the wall.

- During this same inspection, Hunter observes staining to the top of and over the liner, also indicative that the North Tank has been overfilled.

- Despite having functioned without issue for roughly five years prior to Agraliners' involvement, the North Tank liner tears roughly one year after Agraliners repaired the manway boot.

- Plaintiff's expert determines the liner tore/fractured as a result of forces being applied to an area of the liner that was "tented" and "pulled away from the wall". (Richey Report, ECF No. 27-5.)

According to the Defendant, "[t]aking Plaintiff's expert at his word, the above facts demonstrate that the liner was indeed damaged by such acts, as one or more of these acts combined to result in the liner being tented and pulled away from the wall which led to its tear/fracture." (Def.'s Reply 10, ECF No. 37.)

Although it is a close call whether there is evidence from which a jury could find the Defendant's fault to be the more likely cause of the break, the Court finds that the Defendant's argument assumes matters upon which there remains genuine disputes. First, it assumes that the

16

bunching and tenting was caused by "one or more of these acts combined," i.e., product trapped between the liner and the steel tank wall, or the repair of the manway boot. Further, it assumes that the only way the product could have gotten between the liner and the tank wall was by overfilling. While that seems entirely reasonably if there is no defect in the liner, and while the evidence suggests that there was overfilling at some point, it is not clear in the record when that occurred. Although Hunter could not visibly see a tear in the liner when he saw the tenting, that is not conclusive evidence that a crack of some size was not already in existence that was allowing product to get behind the liner. There is no evidence in the summary judgment record to show that such a scenario was not possible. And while the Defendant's assumptions may, in fact, be true, the evidence is not so one-sided as to establish them. With respect to the manway boot, there is no evidence that its installation played any part in the tenting, or the brittle fracture that eventually occurred.[3] The Richey Report does not attempt to make this connection, or to otherwise explain why the liner was tented.

At this stage of the proceedings, the Defendant has not established that the only outcome supported by the evidence is that "damages to the liner from overfilling the tank or from the owner or any other third party entering the tank" have voided the warranty. Viewing the facts in a light most favorable to the Plaintiff, and construing all reasonable inferences in the Plaintiff's favor, the Court finds that factual issues remain that require a trial on the breach of warranty claim for the North Tank liner.

---

[3] The Report described brittle failure a failure that "occurs with little or no plastic deformation. It occurs when the material develops a crack, with propagates rapidly, causing the material to fracture. The failure results from splitting along definite lines and can occur at lower stress levels than a ductile fracture." (Richey Report 3, ECF No. 27-5 at 4 (footnote omitted).)

## C. Damages

The Defendant argues that, as a matter of law, it cannot be held liable for the cost to replace the North Tank floor, which corroded after the Plaintiff left the fertilizer-soaked liner on the bottom of the tank for nearly a year after the visible break in the liner. The Plaintiff was not aware that fertilizer was causing the floor of the tank to rust out.

Consequential damages for breach of warranty "are recoverable if they are the direct, immediate and probable result of the breach." *Jerry Alderman Ford Sales, Inc. v. Bailey*, 291 N.E.2d 92, 103 (Ind. Ct. App. 1973); Ind. Code § 26-1-2-715. In the context of proximate/responsible cause, the question is whether the injury "is a natural and probable consequence, which in the light of the circumstances, should have been foreseen or anticipated." *Control Techniques, Inc. v. Johnson*, 762 N.E.2d 104, 108 (Ind. 2002) (citing *Bader v. Johnson*, 732 N.E.2d 1212, 1218 (Ind. 2000)). The UCC imposes a duty on a buyer to minimize the damages. *Id.* at 1052 (citing Ind. Code § 26–1–2–715). "The issue of whether claimed consequential damages are the foreseeable and proximate result of a breach of an implied warranty is generally determined by the trier of fact." *Irmscher Suppliers, Inc.*, 909 N.E.2d at 1051 (citing *Bob Anderson Pontiac, Inc. v. Davidson*, 293 N.E.2d 232, 236 (1973)).

There is a striking lack of evidence in the record regarding the decision to leave the liner in the North Tank after it failed. It will be for a jury to decide, after a full presentation of evidence, whether the damage to the North Tank floor was a reasonably foreseeable consequence of any breach, and whether the Plaintiff should have minimized the damage.

The parties also dispute what was intended by the "pro-rated materials warranty." The Plaintiff asserts that proration applies solely to damages related to the liners themselves, and not to incidental or consequential damages. The Defendant disagrees, arguing that the adjective "pro-

rated" modified the word "warranty," not just a specific category of damages related to the warranty. "It follows that whatever damages are recoverable under the warranty are also pro-rated." (Def.'s Reply 13.)

In the interest of judicial efficiency, the Court need not resolve the dispute at this time. If a jury determines that the Defendant breached the express warranty, it will be required to find the total amount of damages that were caused by that breach. Additionally, any award could separate out consequential damages. To the extent any of the damages the jury awards should be pro-rated, the appropriate reduction can be made by the Court before the entry of final judgment.

## CONCLUSION

For the reasons stated above, the Court GRANTS IN PART and DENIES IN PART the Defendant's Motion for Summary Judgment [ECF No. 25], which included the arguments set forth in the Defendant's Motion to Strike Evidence Submitted by Plaintiffs in Response to Defendant's Motion for Summary Judgment [ECF No. 34]. Both Motions are termed as pending motions. The Court CONFIRMS the telephonic status/scheduling conference set for March 20, 2019, at 10:30 AM (EST).

SO ORDERED on March 18, 2019.

                               s/ Theresa L. Springmann
                               CHIEF JUDGE THERESA L. SPRINGMANN
                               UNITED STATES DISTRICT COURT